IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TRAVIS D. REAY,

               Petitioner,                      No. CIV S-02-2067 GEB DAD P

     vs.

A. K. SCRIBNER, Warden, et al.,

               Respondents.             <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

entered against him on October 14, 1998 in the Sacramento County Superior Court on a charge

of first degree murder.  He seeks relief on the grounds that: (1) the trial court violated his right to

due process by denying his motion to sever his trial from that of co-defendant Nettie Reay; (2)

his trial counsel rendered ineffective assistance when he failed to request a limiting instruction

regarding evidence of Battered Woman's Syndrome; (3) his right to a fair trial was violated by

improper cross-examination conducted by trial counsel for co-defendant Nettie Reay; (4) his

right to a fair trial was violated by juror misconduct, the inadequacy of the trial court's voir dire

and the refusal of the trial court to dismiss a juror; (5) his right to due process was violated by

jury instruction error; (6) his right to a fair trial was violated because of the jury's exposure to

evidence of his prior acts of domestic violence against Nettie Reay; (7) his trial counsel rendered

ineffective assistance when he failed to object to the admission of evidence of Battered Woman's

Syndrome; (8) his right to a fair trial was violated by the cumulative effect of the errors described

in claims (1) through (7); (9) the prosecutor committed misconduct during his closing argument;

(10) his trial counsel rendered ineffective assistance when he failed to object to the prosecutorial

misconduct in closing argument; (11) his trial counsel rendered ineffective assistance because of

his failure to call petitioner's sister as a witness to testify in support of petitioner's alibi defense;

(12) newly discovered evidence demonstrates that he is factually innocent; and (13) the

California Court of Appeal improperly denied his motion for state habeas counsel.  Upon careful

consideration of the record and the applicable law, the undersigned will recommend that

petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND[1]

We revisit in part the appeals of defendants Travis Reay and Nettie Reay (Travis and Nettie or collectively defendants) on remand from the California Supreme Court.

In a prior unpublished decision, we reversed the judgment against Nettie because the trial court refused to give an instruction on duress for lack of evidence to support the defense, and affirmed as modified the judgment against Travis.  The People petitioned the Supreme Court for review of this issue, which was granted.  A separate petition by Travis was denied.

The Supreme Court has directed us to "vacate [our] decision and to reconsider the cause in light of People v. Anderson (2002) 28 Cal.4th 767" (hereafter Anderson), which held inter alia that duress is not a defense to the crime of murder under Penal Code section 26.[2]

Having done so, we determine that Anderson is retroactive.  Accordingly, we shall affirm the judgment of conviction as to Nettie except to modify her restitution fine.  We shall also affirm

---

[1]  The following summary is drawn from the August 21, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-10, filed in this court on March 25, 2005, as respondent's Lodged Document 10.

[2]  All further section references are to the Penal Code unless otherwise specified.

the judgment of conviction of Travis with a modification as to restitution.

FACTUAL BACKGROUND

On Monday, August 16, 1993, at 1 p.m., law enforcement officers found Angel Dixon, dead, in a field near the Sacramento Airport. She had been stabbed more than 50 times, five of the wounds caused her death, one to the neck and two to each lung.  It was determined that she had probably died more than a day earlier; she might have been killed as early as on the previous Sunday morning.

About three and one-half years later, the Sheriff's Department received a telephone call from a person who asserted the defendants were responsible for the killing.  On October 16, 1996, deputy sheriffs interviewed Nettie.  She implicated Scott DeGraff.  She and DeGraff, who was granted use immunity for his testimony, testified at trial.

DeGraff testified to the following account of the killing.  He was visiting Travis's house; Nettie was also there.  Angel Dixon arrived.  As DeGraff came back from the bathroom she left.  Travis told DeGraff to follow her and tell her that "they were only kidding" and to ask her to return.  He did so.  When she returned with DeGraff, one of the defendants locked the door.

The defendants, yelling, confronted Dixon about "itching her arm" (apparently an idiom for using drugs) in the presence of Travis's nephew.  Dixon attempted to leave.  Nettie struck Dixon, causing her to fall to the floor and then hit her in the nose.  Travis left the room, returned with handcuffs, and, with Nettie's assistance, cuffed Dixon's hands behind her back.  On cross-examination DeGraff conceded that his account in a statement to the police that Nettie continued to hit Dixon for a few minutes was more accurate.  He said he thought Dixon's nose was broken and that she bled profusely.

Travis asserted he was afraid that Dixon would retaliate against his family or his dog through Dixon's association with a motorcycle gang.  He informed DeGraff that he needed to leave the area to avert retaliation.  The defendants took Dixon to DeGraff's car and, following directions from Travis, DeGraff drove to the place where Dixon's body was found.

The defendants took Dixon out of the car.  Nettie struck Dixon several times.  In direct examination, DeGraff said the defendants, holding Dixon's arms, pulled her along into the field to an area of bushes.  On cross-examination, impeached with a statement to police officers, DeGraff said Travis pulled Dixon into the field.  On re-direct examination DeGraff went back to his account of Nettie also pulling Dixon.  DeGraff stayed by the car.  Travis threw

3

Dixon to the ground and got on top of her.  DeGraff saw him making striking motions with an object as Nettie held Dixon down.

Eventually, the defendants returned to the car.  DeGraff saw movement in the brush where Dixon was.  Dixon got up and ran toward the car.  Nettie said: "I don't think she's dead."  Dixon, bloodied, reached the car and beseeched DeGraff to help her.  He pushed her away, saying he did not "want anything to do with it."  On direct examination DeGraff testified that the defendants grabbed Dixon and dragged her back further into the bushes.  On cross-examination DeGraff said he looked away.  On redirect examination he agreed with his statement to the police that on the second occasion, Nettie pushed Dixon to the ground.

On direct examination DeGraff testified that at some point during the first or second assault in the bushes Travis asked Nettie to help because his knife was stuck.  Nettie kneeled or stepped on Dixon's back and Travis pulled the knife out.  On cross-examination DeGraff testified that he did not see Nettie stand on Dixon, that he saw Travis put his foot on Dixon's back during the second assault in the bushes, and that after he returned to the car Travis said the knife had gotten stuck in Dixon.

Eventually the defendants returned to DeGraff's car and he drove to a liquor store in their neighborhood.  Travis said he had to get rid of the knife and he put it in a garbage can.  DeGraff then drove them to the house of a relative of Nettie.  They went into the house for a short time, then they went to a smaller detached residence in the backyard.  Nettie told DeGraff where a hose was located and he washed the blood off of the car.  DeGraff then left with his car and did not see either defendant for a couple of months.

On cross-examination DeGraff testified that after the killing they had first gone to the house of Travis Reay's mother.  DeGraff said that Travis's mother had acted hysterical and Travis had struck her.  After they arrived at the second house, Nettie was upset and asking Travis, "why did you do it?"  He was angered and struck her in the nose and in the stomach, causing her to drop to her knees, gasping.

Nettie testified at trial.  Her account of the killing differs from that of DeGraff as to some details.  She assaulted Dixon at Travis's house because he told her to "whip her ass."  She went to DeGraff's car because she was told to do so.  When they arrived at the field Travis removed the handcuffs from Dixon and told her she had 10 seconds to run.  Dixon ran off and Travis ran after her.  Dixon went down out in the field and Travis was on top of her, hitting her.  After about five minutes he told Nettie to come to him.  She went and saw Dixon lying "full of blood."  Travis had two knives.  He handed one to her and told her to "stick" Dixon.  She did so three or four times, once in the stomach, the others in the legs.  She did not think Dixon was alive.

4

When she walked back to the car Dixon got up and started to run. Travis ran after Dixon and stabbed her again. She did not "remember" Dixon coming to the car as Degraff had testified. When Travis came back to the car he said the knife was stuck and he could not get it out.

The first place they went after the killing was to Nettie's mother's house. They washed the car off and then walked to her cousin's house. She gave the handcuffs to her cousin to dispose of, but Travis asked what she was doing and she took them back. They walked to a donut shop to meet Travis's mother. In the parking lot Nettie became emotional and Travis struck her. They went to his house and she went straight to the bedroom.

Nettie Reay also testified on direct examination that the reason she beat Dixon and later stabbed her was because she was afraid of disobeying Travis's directions. She believed that if she did not beat Dixon she would be beaten and that if she did not stab Dixon she also would be laying in that field. She testified that her father abused her mother. She testified that since about 13 she had cohabited with a man who beat her regularly and severely until the relationship ended in October 1992. She met Travis in January 1993 and commenced a relationship with him. He soon began to slap her and push her around and one one occasion before the killing beat her severely. He hit her two, three, sometimes four times a month. (Seven or eight months after killing Dixon they married.) He beat her up in front of his mother, who attended the trial.

On cross-examination Nettie was impeached with statements that she had given law enforcement officers. She denied she told them she had chased Dixon after the first stabbing episode and stabbed her again. She conceded the officers asked if she had been forced to participate and she did not indicate she had been. She conceded she had beaten Dixon in part because she was angry about her drug use in the presence of Travis's nephew. She admitted saying she wanted to accompany Travis to make sure he did not engage in sexual conduct with Dixon. If he had tried that she would have told him no. She conceded she told the detectives she did not know why she stabbed Dixon and that she agreed with their statement: "You just did it because you wanted to be part of the group[.]"

Charlotte Scharp, DeGraff's fiancé, testified that in the spring of 1993, after she had stopped dating Travis, he invited her to his house. When she arrived he handcuffed her hands behind her back and Travis and another man abused her, squirting water on her, pushing her from one to the other, and smacking and kicking her.

Linda Arnell, Nettie's mother, testified she was awakened in the middle of the night in August 1993 by her daughter, who told her

5

she needed to park DeGraff's car in her garage because it had blood on it or in it.  Nettie said DeGraff and Travis were with her. Arnell denied the request but said she could use the hose to wash the car off.

Connie Teeters, Nettie's cousin, testified that in mid-August 1993, when she was 14 years old and living near Arnell's house, Nettie made a noise at her window one night between midnight and 3 a.m. Teeters went to the window and saw Travis and Nettie, alone. Nettie said:  "we just killed somebody."  She handed Teeters a pair of handcuffs and said to hide them or throw them away.  Teeters threw them in her trash can.  At this point Travis said:  "What are you doing?"  Nettie told Teeters to return the handcuffs.  She did so.

Connie Teeters's mother, Nettie's aunt, Doris Teeters, testified that the day before the discovery of Dixon's body was announced on the evening news, her niece told her of the killing.  Her account of the conversation is consistent with the broad outline of Nettie's trial testimony.  Doris Teeters said that Nettie asked her if Connie Teeters talked to her about seeing her the night before.

Nettie adduced the opinion testimony of two expert witnesses concerning the battered women's syndrome.  Dr. Linda Barnard, a licensed marriage and family child counselor, opined that Nettie suffered from this syndrome at the time of the Dixon killing.  A woman in this condition believes there is no escape and copes by choosing submissive behaviors.  Symptoms include depression, flashbacks, startled response, and hypervigilance.  Nettie demonstrated these typical symptoms.

She testified that Nettie does not cope with domestic violence well, "she just goes downhill pretty quickly into depression and into compliance."  She is prone to enter a disassociative state, in which the psyche protects itself from trauma by emotional numbness: "she finally just sort of gave up and just didn't feel."

Dr. Barnard testified that Nettie only told her of two specific instances of battery by Travis before the killing, one in February and one in March 1993.  However, as a rule she does not ask about every instance of battery when doing an interview.

Dr. Phyllis Kaufman, a licensed clinical psychologist and social worker, opined that Nettie suffers from post-traumatic stress disorder, consistent with the battered women's syndrome, as a result of witnessing domestic violence as a child and being battered from age 13 on.  Emotional stress impairs her judgment and an excess of stress causes a disassociative state in which she is not able to make effective judgments and she becomes impulsive and confused.  When she cannot cope with stress she suffers loss of cognitive control:  "Loss of intellectual ability to understand what

6

1   she is doing, that ability to look at one's self and be in control of
    one's behavior.  She loses that.  She does not know what she is
2   doing.  She becomes a robot and takes orders from others."

3   Travis did not testify, nor did he call his mother as a witness.  He
    called Stephanie Schaefer, who testified that she was at his house
4   from 6 or 7 p.m. on the night of August 15, 1993.  Schaefer said
    that Nettie was there when she arrived but left an hour later.
5   Schaefer spent the night, sleeping on the living room sofa, and
    Travis did not leave his house that night.  Schaefer's account of the
6   evening of August 15, 1993, was corroborated by testimony of
    David Coe, who also said he spent that night in the living room.

7

8                               ANALYSIS

9   I.  Standards of Review Applicable to Habeas Corpus Claims

10           A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

11  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

12  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

13  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

14  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

15  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

16  corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

17  (1972).

18           This action is governed by the Antiterrorism and Effective Death Penalty Act of

19  1996 ("AEDPA").  See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

20  1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

21  habeas corpus relief:

22           An application for a writ of habeas corpus on behalf of a
             person in custody pursuant to the judgment of a State court shall
23           not be granted with respect to any claim that was adjudicated on
             the merits in State court proceedings unless the adjudication of the
24           claim -

25           (1) resulted in a decision that was contrary to, or involved
             an unreasonable application of, clearly established Federal law, as
26           determined by the Supreme Court of the United States; or

                                          7

1              (2) resulted in a decision that was based on an unreasonable
2    determination of the facts in light of the evidence presented in the
State court proceeding.

3    28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

4    Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

5            The court looks to the last reasoned state court decision as the basis for the state

6    court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

7    court reaches a decision on the merits but provides no reasoning to support its conclusion, a

8    federal habeas court independently reviews the record to determine whether habeas corpus relief

9    is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

10   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

11   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

12   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

13   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

14   1167 (9th Cir. 2002).

15   II.  Petitioner's Claims

16       A.  Motion for Severance (Claim I)

17           Petitioner claims that the trial court violated his right to due process when it

18   denied his motion to sever his trial from that of his co-defendant Nettie Reay.  Petitioner explains

19   his claim in this regard as follows:

20           At the commencement of trial, petitioner's counsel moved to sever
     petitioner's trial from that of codefendant Nettie Reay.  Counsel
21   argued that petitioner and Nettie would present totally antagonistic
     defenses at trial because it was anticipated that Nettie would assert
22   a defense based upon domestic violence and Battered Woman's
     Syndrome and provide evidence that she assisted in killing April
23   Dixon only because she feared that petitioner would kill Nettie if
     she refused.  Petitioner, on the other hand, would present a defense
24   of alibi, and assert that he was not present on the scene and did not
     participate in the homicide.  The trial court denied this motion.
25
     The court erred in refusing to sever petitioner's trial from that of
26   Nettie Reay because the defenses of petitioner and Nettie were

completely antagonistic. Petitioner's defense was that of alibi. His primary witnesses Stephanie Schaefer and David Coe testified that they were with petitioner at his home at the time Dixon was killed; they further testified that Nettie at some point left by herself disgruntled and possibly intoxicated. On the other hand, Nettie's defense was that she was a victim of repeated domestic violence carried out by petitioner and her prior boyfriend and that she participated in killing Dixon because petitioner ordered her to do so and implicitly threatened serious bodily injury if she did not obey. Extensive evidence put on by Nettie through her own testimony and her expert witnesses described petitioner as having subjected Nettie to severe physical and psychological abuse which included frequent beatings and repeated threats to take Nettie's daughter Karen away from her. All of this evidence that petitioner repeatedly assaulted and battered Nettie was completely irrelevant to the question of whether petitioner was guilty of murdering Dixon and such evidence would not have been admitted at petitioner's trial if he had been tried alone.

The prejudice flowing from wrongful denial of severance was compounded by the court's additional error in failing to provide adequate limiting instructions precluding the jury from using the domestic violence evidence introduced by Nettie as evidence that petitioner was guilty of assaulting and killing Dixon.

(Second Amended Petition (hereinafter Pet.) at 3-4.)

The California Court of Appeal rejected petitioner's arguments in this regard, reasoning as follows:

Travis claims that, regardless of error in denying the motion for severance, the gross unfairness arose because Nettie adduced evidence of his acts of domestic violence in support of her claim she lacked the requisite mental states for conviction. We disagree.

The evidence of uncharged misconduct is not "particularly disgusting" (citation omitted), in comparison with the crime charged against the defendants and it is essentially dependent upon Nettie's testimony. Travis's defense was she is a lying, vengeful former spouse who made up the story about him to injure him and to cover her own guilt. She admitted beating up the victim, and her self serving testimony of abuse by Travis (among others) did not independently and differentially tend to besmirch him.

The case against Travis was strong. DeGraff and his codefendant agreed on most of the events and on Travis's central role. Their account was corroborated by Nettie's relatives. The only defense offered was alibi. However, even if the testimony of the alibi witnesses was accepted, it was immaterial unless the killing took

9

1    place the night before the discovery of Dixon's body.  But Doris
     Teeters testified she was told of the killing the day before the body
2    was found.  As related, Travis did not call his mother as a witness
     to deny the testimony that he struck her on the night of the killing.
3

4    After a review of the entire record, we are unable to say that Travis
     was probably convicted because of an illicit inference of propensity
5    to do evil derived from the evidence of uncharged misconduct.

6    Accordingly, the contention of error in the nature of a denial of a
     fair trial has no merit.

7    (Opinion at 33-34.)

8          A court may grant habeas relief based on a state court's decision to deny a motion

9    for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair

10   trial.  Zafiro v. United States, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a

11   serious risk that a joint trial would compromise a specific trial right of one of the defendants, or

12   prevent the jury from making a reliable judgment about guilt or innocence"); United States v.

13   Lane, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional

14   violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right

15   to a fair trial"); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (same); see also

16   Comer v. Schiro, 480 F.3d 960, 985 (9th Cir.) (in the context of the joinder of counts at trial,

17   habeas relief will not be granted unless the joinder actually rendered petitioner's state trial

18   fundamentally unfair and therefore violative of due process), cert. denied, ___U.S.___, 127 S. Ct.

19   2455 (2007).  Petitioner bears the burden of proving that the denial of severance rendered his trial

20   fundamentally unfair,  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997), and must establish

21   that prejudice arising from the failure to grant a severance was so "clear, manifest, and undue"

22   that he was denied a fair trial.  Lambright v. Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999)

23   (quoting United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).

24         On habeas review, federal courts neither depend on the state law governing

25   severance, Grisby, 130 F.3d at 370 (citing Hollins v. Dep't of Corrections, State of Iowa, 969

26   F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded

1  to criminal defendants in the federal criminal justice system.  Id.  Rather, the relevant question is

2  whether the state proceedings satisfied due process.  Id.; see also Cooper v. McGrath, 314

3  F. Supp. 2d 967, 983 (N.D. Cal. 2004).

4          This court concludes that the trial court's denial of petitioner's motion for

5  severance did not render petitioner's trial fundamentally unfair.  First, the court notes that

6  "mutually antagonistic defenses are not prejudicial per se."  Zafiro, 506 U.S. at 538.  In light of

7  the overwhelming evidence of petitioner's guilt, the admission of evidence that petitioner

8  routinely beat Nettie, while potentially harmful to petitioner, did not rise to the level of a due

9  process violation.  The evidence regarding Battered Woman's Syndrome and domestic violence

10  was admitted only to support Nettie's defense.  This evidence was tangential to the issue of

11  whether petitioner murdered Dixon.  In other words, evidence that petitioner had battered Nettie

12  would not necessarily lead a jury to conclude that petitioner had murdered Dixon.  Under these

13  circumstances, Nettie's testimony regarding Battered Woman's Syndrome would not have

14  prevented the jury from making a reliable judgment about whether petitioner was guilty of

15  Dixon's murder.  See United States v. Matta-Ballesteros, 71 F.3d 754, 770-71 (9th Cir. 1995)

16  (upholding trial court's denial of defendant's motion for severance from co-defendants, even

17  though evidence was introduced at trial involving three homicides and marijuana enterprise with

18  which defendant was not involved); United States v. Escalante, 637 F.2d 1197, 1201-02 (9th Cir.

19  1980) (upholding denial of severance, even though evidence relating to co-defendant's

20  connection to organized crime and participation in murder was admitted).

21          The jurors at petitioner's trial were instructed that: (1) the evidence of Battered

22  Woman's Syndrome could only be considered for the purpose of determining whether Nettie had

23  the requisite mental state to commit murder and whether she was a credible witness; (2) they

24  were to consider each defendant separately in deciding whether either defendant was guilty or not

25  guilty; and (3) each defendant was entitled to an individual determination of whether he/she was

26  a member of a conspiracy to murder Dixon.  (Resp'ts' Lodged Document 15 (hereinafter CT) at

11

421, 445, 463.)  These instructions were sufficient to cure any possibility of prejudice arising

from the trial court's decision not to grant petitioner's motion for a separate trial.  See Zafiro, 506

U.S. at 541 (finding similar jury instructions sufficient to cure any prejudice arising from joint

trial of defendants with antagonistic defenses); United States v. Nelson, 137 F.3d 1094, 1108 (9th

Cir. 1998).[3]

The decision of the state courts that petitioner's right to due process was not

violated by the denial of his motion to sever is not contrary to or an unreasonable application of

the federal due process principles set forth above.  Accordingly, petitioner is not entitled to relief

on his claim that the trial court erred in denying his motion to sever his trial from that of his co-

defendant.

B.  Ineffective Assistance of Counsel

Petitioner raises several claims of ineffective assistance of trial counsel.  After

setting forth the applicable legal principles, the court will evaluate two of these claims below.

1.  Legal Standards

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

counsel, a petitioner must first show that, considering all the circumstances, counsel's

performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a

petitioner identifies the acts or omissions that are alleged not to have been the result of

reasonable professional judgment, the court must determine whether, in light of all the

circumstances, the identified acts or omissions were outside the wide range of professionally

---

[3] Finally, Nettie Reay's testimony regarding petitioner's involvement in the murder could
have been admitted against petitioner in a separate trial.  See Zafiro, 506 U.S. at 540 ("A
defendant normally would not be entitled to exclude the testimony of a former codefendant if the
district court did sever their trials, and we see no reason why relevant and competent testimony
would be prejudicial merely because the witness is also a codefendant").

1    competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

2    petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

3    466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

4    counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

5    694.  A reasonable probability is "a probability sufficient to undermine confidence in the

6    outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

7    (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

8    deficient before examining the prejudice suffered by the defendant as a result of the alleged

9    deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

10   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

11   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

12          In assessing an ineffective assistance of counsel claim "[t]here is a strong

13   presumption that counsel's performance falls within the 'wide range of professional assistance.'"

14   Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There

15   is in addition a strong presumption that counsel "exercised acceptable professional judgment in

16   all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

17   Strickland, 466 U.S. at 689).

18          2.  Trial Counsel's Failure to Request a Limiting Instruction Regarding

19   Evidence of Battered Woman's Syndrome (Claim II)

20          Petitioner claims that his trial counsel rendered ineffective assistance when he

21   failed to request a limiting instruction regarding the Battered Woman's Syndrome and domestic

22   violence evidence introduced at the joint trial.  Petitioner describes this claim as follows:

23              In moving for severance, petitioner's trial counsel had argued, inter
            alia, that absent severance, petitioner's jury would be exposed to
24          evidence, presented by Nettie's counsel, regarding petitioner
            engaging in acts of domestic violence.  Given this awareness on
25          defense counsel's part and the fact that his severance motion was
            denied, it was accordingly incumbent upon counsel to request that
26          appropriate limiting instructions to be given to the jury.  Such

13

1    instructions patterned after CALJIC No. 2.07 (evidence limited to
     one defendant only) and/or CALJIC No. 2.50 (consideration of
2    other-crime evidence), would have told the jurors that they could
     not consider Nettie's evidence of domestic violence as evidence
3    against petitioner (CALJIC No. 2.07) or that they could not, under
     any circumstances, consider the domestic violence evidence for
4    purposes of "prov[ing] that defendant is a person of bad character
     or that he has a disposition to commit crimes" (CALJIC No. 2.50).

5

6    (Pet. at 4.)

7            The California Court of Appeal rejected these arguments, reasoning as follows:

8            Nor is ineffective assistance of counsel demonstrated by the failure
             to request a limiting instruction.  The jury was directed by the
9            instructions given to consider the evidence, if believed, for
             purposes of determining Nettie's mental state and credibility.
10           Travis's counsel reasonably could have decided as a tactical matter
             that this was sufficient and that drawing further attention to the
11           evidence would be counter productive.

12   (Opinion at 34-35.)

13           The decision by the state appellate court rejecting petitioner's claim of ineffective

14   assistance of counsel is not contrary to or an unreasonable application of Strickland and should

15   not be set aside.  Petitioner has failed to establish a reasonable probability that, but for counsel's

16   error in failing to request additional limiting instructions, the result of the proceeding would have

17   been different.  In this regard, petitioner's jury was given a limiting instruction explaining how to

18   evaluate the evidence of domestic violence.  That instruction was sufficient for the reasons stated

19   by the state appellate court.  Accordingly, petitioner is not entitled to relief on this claim.

20           3.  Trial Counsel's Failure to Object to the Admission of Evidence of Battered

21   Woman's Syndrome (Claim VII)

22           Petitioner claims that his trial counsel rendered ineffective assistance by failing to

23   "move that the domestic violence and Battered Women's Syndrome Evidence . . . should have

24   been excluded from petitioner's trial as irrelevant and highly prejudicial."  (Pet. at 13.)  Petitioner

25   argues that in 1998, when his trial took place, the question of whether evidence of duress could

26   /////

                                                14

1  serve as a defense to a charge of murder had not been resolved by the state courts.  (Id.)

2  Accordingly,

> Defense counsel had an obligation to raise such an objection for
> purposes of maximizing his client's chances for acquittal, as well
> as to preserve this objection for subsequent review if the domestic
> violence evidence was admitted and petitioner was convicted.
> Furthermore, there could be no satisfactory tactical reason for
> defense counsel's failure to move to exclude the domestic violence
> evidence.  As indicated by his severance motion, defense counsel
> was well aware of the great potential prejudice which could flow
> from the jury's being permitted to consider, in a wholesale and
> unlimited manner, evidence of petitioner's engaging in repeated
> and severe acts of domestic violence and the danger that the jury
> would conclude, based upon this evidence, that petitioner was a
> bad person with a predisposition towards crime and violence.
> Accordingly, given that defense counsel's severance motion was
> denied, it should have been incumbent upon counsel to move to
> exclude Nettie's evidence of domestic violence and Battered
> Woman's Syndrome.

12  (Id. at 13-14.)

13        In People v. Anderson, 28 Cal. 4th 767 (2002), which was decided after the

14  California Court of Appeal issued its first decision in this case, the California Supreme Court

15  held that duress is not an affirmative defense to the crime of murder.  Id. at 780.  The court

16  recognized, however, that the circumstances of duress are relevant to a determination of

17  premeditation, deliberation and implied malice.  Id. at 780-84.  In its opinion after remand from

18  the California Supreme Court, the California Court of Appeal concluded that the evidence of

19  Battered Woman's Syndrome introduced at trial by his co-defendant was not unduly prejudicial

20  to petitioner and, in any event, was relevant to "establish Nettie's defense that she was a battered

21  woman who feared Travis and that she acted out of fear rather than malice."  (Opinion at 36.)

22  The state appellate court concluded that "because the evidence of BWS was properly admitted,

23  defendant's alternative contention that counsel was ineffective for failing to object to the

24  evidence is likewise rejected."  (Id.)

25        Petitioner's jury was instructed to use evidence of Battered Woman's Syndrome

26  only for the purpose of determining Nettie Reay's mental state or to evaluate her credibility.  (CT

15

at 421.)  The jury was not instructed that duress was a possible defense to murder.  Under these

circumstances, it was not necessary for petitioner's counsel to object to the evidence of Battered

Woman's Syndrome on the grounds that it was irrelevant to the murder charge.  In addition, for

the reasons expressed below in connection with this court's analysis of petitioner's claim

regarding the introduction of evidence of domestic violence (Claim VI), admission of such

evidence did not render petitioner's trial fundamentally unfair.  Accordingly, the failure of

petitioner's trial counsel to object to the admission of this evidence on due process grounds did

not constitute ineffective assistance.  See Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir.

2000) (an attorney's failure to make a meritless objection or motion does not constitute

ineffective assistance of counsel).  See also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996)

("the failure to take a futile action can never be deficient performance").

　　　　　For the foregoing reasons, the conclusion of the state appellate court that

petitioner's trial counsel did not render ineffective assistance by failing to object to the admission

of evidence of Battered Woman's Syndrome offered by petitioner's co-defendant is not contrary

to or an unreasonable application of Strickland.  Accordingly, petitioner is not entitled to relief

on this claim.

　　　　　C.  Ineffective Assistance of Counsel for Co-Defendant Nettie Reay (Claim III)

　　　　　Petitioner claims his right to a fair trial was violated by improper cross-

examination of witness Charlotte Scharp conducted by counsel for co-defendant Nettie Reay.

The California Court of Appeal fairly described the background to this claim as follows:

> Nettie's counsel, at the conclusion of the questioning of Scharp,
> asked if Travis engaged in any other incident of assault on her after
> the incident in which she was handcuffed.  She answered that he
> ran her off the road in a driving incident.  The trial court
> immediately called a bench conference and upon going back on the
> record directed the jury to disregard all testimony concerning the
> purported incident.

(Opinion at 36-37.)

/////

1          Petitioner argues that Nettie Reay's trial counsel committed error in eliciting this

2   testimony from Scharp and that the error violated his right to a fair trial.  He argues,

3                This illicit evidence which codefendant's counsel smuggled before
             the jury was highly prejudicial.  Although petitioner's jury was
4            exposed to evidence of petitioner's past violent behavior by way of
             beating Nettie Reay and a physical altercation with Charlotte
5            Scharp, the automobile incident involving Scharp was the only
             evidence the jury heard that petitioner had engaged in a potentially
6            deadly attack on someone (other than the present homicide victim
             April Dixon).  Therefore, this illicit evidence was highly
7            prejudicial in the context of petitioner's being tried for a murder.

8   (Pet. at 6.)

9          On appeal, the prosecution conceded that Nettie Reay's trial counsel erred in

10  eliciting the above-described testimony at petitioner's trial.  (Opinion at 36.)  The California

11  Court of Appeal concluded, however, that the error was not prejudicial.  The appellate court

12  explained its reasoning as follows:

13               This is not the kind of exceptional case where this miscue is
             reasonably likely to have tipped the balance.  If the jury found the
14           earlier portion of Scharp's testimony believable, they already
             would have accepted the fact that Travis possessed handcuffs and
15           used them to restrain a woman while he engaged in an unprovoked
             assault in concert with another man.  It is unlikely the brief
16           reference to an additional nondescript assault, related by DeGraff's
             fiancé, would alter the balance significantly in favor of her
17           credibility or that it would tip the balance in the case at large.  We
             conclude there was no prejudicial error.

18

19  (Opinion at 37.)

20         The decision of the California Court of Appeal that the error made by Nettie

21  Reay's trial counsel did not render petitioner's trial fundamentally unfair is not contrary to or an

22  unreasonable application of federal law and should not be set aside.  For the reasons described by

23  the state appellate court, Scharp's very brief reference to an incident that was far less prejudicial

24  than her testimony regarding the attack upon her by petitioner and his friend could not have had a

25  substantial impact on the verdict in this case.  Further, any possible prejudice would have been

26  /////

17

1   alleviated, if not eliminated, by the trial judge's admonition to the jury to disregard Scharp's

2   testimony about the road incident.  Accordingly, petitioner is not entitled to relief on this claim.

3        D.  Juror Misconduct (Claim IV)

4            Petitioner claims that his right to a fair trial was violated by juror misconduct, the

5   inadequacy of the trial court's voir dire, and the refusal of the trial court to dismiss a juror who

6   had been the victim of domestic violence in her childhood.  Petitioner explains his claim in this

7   regard as follows:

8            Petitioner did not receive a fair jury trial because: 1) in the course
             of voir dire Juror Number Two committed misconduct by failing to
9            reveal her experiences with domestic violence, which was an issue
             in this case; 2) the trial court's voir dire questions were not
10           sufficiently probing so as to reveal the biases of potential jurors;
             and 3) the trial court improperly refused defense counsel's request
11           to dismiss Juror Number Two when her personal traumatic
             childhood experiences caused her to be emotionally affected during
12           jury deliberations.

13   (Pet. at 6-7.)

14           The California Court of Appeal fairly explained the background to petitioner's

15   claims of juror misconduct as follows:

16           During jury deliberations, the foreperson sent a note to the court
             asserting that some jurors were concerned about the impartiality of
17           one of the jurors.  The court and counsel questioned the foreperson
             who gave the following account.  Juror Two appeared withdrawn.
18           When asked about it she complained that another juror had been
             disrespectful of her opinions and then she became very emotional.
19           She said when she was a child her father beat up and battered the
             mother and the children and that she had had therapy as an adult to
20           deal with the problem.  Ten of the jurors felt she could be impartial
             but two did not think so.

21
             After conferring with counsel about proposing questions, the court
22           questioned Juror Two, who gave the following account.  She and
             her brothers and sisters had been disciplined violently when she
23           was a child.  She had received counseling, however, not as a
             specific result of this.  She did cry during deliberations, however,
24           she had not refused to participate in deliberations.  She had not
             brought her childhood experiences up during voir dire, because she
25           had interpreted the questions as calling for a response only if the
             venire member felt that she could not be impartial.  She continued
26           to believe that she could be impartial.

1    |    Travis argues that Juror Two committed misconduct in failing to
2    |    bring up her childhood experiences with violent discipline after
     |    another member of the venire was excused after she told the court
3    |    she did not think she could be impartial because she had a friend
     |    who was battered and who killed her husband.  He argues she also
4    |    committed misconduct in not volunteering the information in
     |    response to questions on the jury questionnaire, as follows.  Asked
5    |    if she could be impartial, knowing what she did of the case, she
     |    answered yes.  Asked if there was anything she would like to bring
6    |    to the court's attention that might affect her ability to be impartial,
     |    she answered no.  Asked if she had been a witness to a crime, she
7    |    answered no.

8    (Opinion at 38-39.)

9         Petitioner also notes in support of his claim of juror misconduct that, at the

10   beginning of jury voir dire, the trial court advised the potential jurors that a defense of "Battered

11   Woman's Syndrome" might be raised and that, if it was, the jurors would receive an instruction

12   to the effect that any evidence relating to that defense could only be considered for the purpose of

13   determining whether or not Nettie Reay formed the mental state necessary for murder or whether

14   Nettie Reay was a credible witness.  (Reporter's Transcript on Appeal (RT) at 389-90.)  The trial

15   judge asked the jurors whether they could carefully and fairly consider such an instruction and

16   whether, in light of these statements, any juror felt they could not serve on the case or had a

17   "change of heart."  (Id. at 393.)  Juror No. Two did not respond in any way to these remarks by

18   the trial judge.  Petitioner argues that Juror No. Two should have revealed her childhood

19   experiences at that time.  Petitioner also argues that, to the extent Juror No. Two did not

20   understand she should reveal on voir dire her past history with domestic violence, the trial court's

21   questions to the potential jurors were not sufficiently specific to apprise her of her duty in this

22   regard.

23        The California Court of Appeal rejected petitioner's argument on this issue,

24   reasoning as follows:

25   |    Misrepresentation by a juror in response to voir dire is misconduct.
     |    (citation omitted.)  Travis submits the aforementioned answers and
26   |    omissions can only be perceived as untruthful, hence

1
2
3
4
5
6
7
8

misrepresentations.  However, all but one of the matters on which he relies are questions calling for opinions of the venire member concerning her own impartiality.  At this remove, we cannot say that Juror Two was answering falsely when she opined she could be impartial.  The remaining question called for her to assess whether she had been a witness to a crime.  A venire member might well fail to connect this characterization with violent childhood discipline, e.g., corporal punishment, or truthfully assess such discipline as not criminal, depending upon the severity, dates of occurrence, or place of occurrence.

On this record, the conclusion that Juror Two was untruthful is not compelling, the trial court could reasonably conclude there was no misconduct.  (citations omitted.)  For the same reason, the trial court did not err in denying the motion to remove Juror Two.

9
10
11
12
13
14
15
16
17

For his claim the court was obliged to conduct a more extensive or focused voir dire to require the disclosure of Juror Two's childhood experience, the defendant relies on People v. Chapman (1993) 15 Cal.App.4th 136, discussing the "new system of court-conducted voir dire . . . ." (Id. at p. 141.)  In that case the court refused to voir dire on a salient point, thereby prejudicially constricting the voir dire.  Chapman is simply inapposite where the parties are permitted to ask their own questions and there is no showing that an area of inquiry was restricted.  In these circumstances, we discern no abuse of the trial court's discretion in asking the venire whether particular matters would present them a difficulty in being impartial, rather than eliciting all facts concerning their background that might afford an inference of a potential problem concerning impartiality.

The contention of error in the nature of juror misconduct has no merit.

18
(Opinion at 39-40.)[4]

19
The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

20
fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).

21
See also Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Green v. White, 232 F.3d 671, 676 (9th Cir.

22
2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide

23
24
25
26

---

[4]  On remand from the California Supreme Court, the California Court of Appeal concluded that it was not required to revisit its opinion with respect to this claim in light of the decision in United States v. Gonzalez, 214 F.3d 1109 (9th Cir. 2000).  (Opinion at 41-42.)  As the discussion which follows reveals, this court has taken the Gonzalez holding into consideration in issuing these findings and recommendations.

1   the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  See also

2   United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  Jurors are objectionable if they

3   have formed such deep and strong impressions that they will not listen to testimony with an open

4   mind.  Irvin, 816 U.S. at 722 n.3.  A defendant is denied the right to an impartial jury if even one

5   juror is biased or prejudiced.  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc);

6   United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979).  Thus, "[t]he presence of a biased

7   juror cannot be harmless; the error requires a new trial without a showing of actual prejudice."

8   Gonzalez, 214 F.3d at 1111 (quoting Dyer, 151 F.3d at 973 n.2).

9          Courts have analyzed juror bias under two theories, actual bias and implied (or

10  presumed) bias, either of which may support a challenge of a prospective juror for cause.  Fields

11  v. Brown, 503 F.3d 755, 766 (9th Cir. 2007).  Actual bias is "'bias in fact' – the existence of a

12  state of mind that leads to an inference that the person will not act with entire impartiality."

13  Gonzalez, 214 F.3d at 1112 (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)).  A

14  trial judge's conclusion, after a hearing, that a juror does or does not harbor "actual bias" is a

15  finding of fact to which the presumption of correctness applies.  Dyer, 151 F.3d at 973.  This is

16  because such a decision "depends heavily on the trial court's superior ability to appraise witness

17  credibility and demeanor."  Thompson v. Keohane, 516 U.S. 99, 99-100 (1995).  See also

18  Wainwright v. Witt, 469 U.S. 412, 428 (1985) ( "[T]he question whether a venireman is biased

19  has traditionally been determined through voir dire culminating in a finding by the trial judge

20  concerning the venireman's state of mind.  . . . such a finding is based upon determinations of

21  demeanor and credibility that are peculiarly within a trial judge's province.").

22          "Although actual bias is the more common grounds for excusing jurors for cause,

23  '[i]n extraordinary cases, courts may presume bias based upon the circumstances.'"  Gonzalez,

24  214 F.3d at 1112 (quoting Dyer, 151 F.3d at 981).  See also McDonough Power Equipment, Inc.

25  v. Greenwood, 464 U.S. 548, 556-57 (1984) (Blackmun, Stevens and O'Connor, JJ., concurring)

26  (accepting that "in exceptional circumstances, that the facts are such that bias is to be inferred");

1   id at 558 (Brennan and Marshall, JJ, concurring in the judgment) (agreeing that "[t]he bias of a

2   prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively

3   presumed as [a] matter of law") (alterations in original) (quotations omitted); Smith v. Phillips,

4   455 U.S. 209, 221-24 (1982) (O'Connor, J, concurring) ("there are some extreme circumstances

5   that would justify a finding of implied bias"); Clark v. United States, 289 U.S. 1, 11 (1933).

6   Thus, the Ninth Circuit has, in several cases, presumed bias from "the 'potential for substantial

7   emotional involvement, adversely affecting impartiality,' inherent in certain relationships."

8   Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990) (quoting United States v. Allsup, 566 F.2d 68,

9   71 (9th Cir. 1977)).  See also Green, 232 F.3d at 676; Gonzalez, 214 F.3d at 1112-14; Dyer, 151

10  F.3d at 981-82; Eubanks, 591 F.2d at 517.

11          The distinction between actual and implied bias has been explained as follows:

12          Unlike the inquiry for actual bias, in which we examine the juror's
            answers on voir dire for evidence that she was in fact partial, the
13          issue for implied bias is whether an average person in the position
            of the juror in controversy would be prejudiced.  Accordingly, we
14          have held that prejudice is to be presumed where the relationship
            between the prospective juror and some aspect of the litigation is
15          such that it is highly unlikely that the average person could remain
            impartial in his deliberations under the circumstances.

16

17  Gonzalez, 214 F.3d at 1112 (citations and internal quotes omitted).  Accordingly, implied bias

18  may be found despite a juror's denial of any partiality.  Torres, 128 F.3d at 45 ("And in

19  determining whether a prospective juror is impliedly biased, 'his statements upon voir dire [about

20  his ability to be impartial] are totally irrelevant.'"); Gonzales v. Thomas, 99 F.3d 978, 987 (10th

21  Cir. 1996); United States v. Nell, 526 F.2d 1223, 1229 n.8 (5th Cir. 1976) (The concept of

22  implied or presumed bias arises from "situations in which the circumstances point so sharply to

23  bias in a particular juror that even his own denials must be discounted.").  Implied bias is bias

24  conclusively presumed as a matter of law.  United States v. Wood, 299 U.S. 123, 133 (1936);

25  United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2000) (citing Torres, 128 F.3d at 45).  On

26  collateral review, a petitioner alleging juror misconduct must show that the alleged error " 'had

substantial and injurious effect or influence in determining the jury's verdict.' "  Jeffries v.

Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637

(1993)).

In McDonough, a juror failed to inform the trial court, after a question on voir dire

seeking to elicit information about previous injuries to members of the juror's immediate family

that resulted in disability or prolonged pain, that his son had sustained such an injury.  464 U.S.

at 550.  The juror explained that he did not believe his son's injury (a broken leg) was relevant to

the trial court's inquiry because it did not result in disability or prolonged pain.  Id. at 552 n.3.  In

declining to order a new trial on the basis of juror bias, the United States Supreme Court

explained:

> To invalidate the result of a three-week trial because of a juror's
> mistaken, though honest response to a question, is to insist on
> something closer to perfection than our judicial system can be
> expected to give.  A trial represents an important investment of
> private and social resources, and it ill serves the important end of
> finality to wipe the slate clean simply to recreate the peremptory
> challenge process because counsel lacked an item of information
> which objectively he should have obtained from a juror on voir
> dire examination.

Id. at 555.  The Supreme Court held in that case that "to obtain a new trial in such a situation, a

party must first demonstrate that a juror failed to answer honestly a material question on voir

dire, and then further show that a correct response would have provided a valid basis for a

challenge for cause."  Id. at 556.

In Fields, a juror in a rape trial disclosed on voir dire that his wife had been

assaulted and beaten, but failed to specify that she had also been raped.  When questioned after

the verdict at an evidentiary hearing before the federal district court about this voir dire answer,

the juror explained that when he volunteered that his wife had been assaulted and beaten, he

expected for people in the courtroom to understand that she had been sexually abused.  Fields,

503 F.3d at 765.  The juror testified that, if asked, he would have said that he could be fair and

impartial.  Id.  He explained that he told the truth when he stated he would base his decision

23

1    strictly on the evidence presented, and stated that he did his best to be a fair juror.  Id.  The

2    district court found that the juror was not dishonest during voir dire, that he was not actually

3    biased, and that application of the implied bias doctrine in the absence of juror dishonesty would

4    be a new rule barred by Teague v. Lane, 489 U.S. 288 (1989).  Fields, 503 F.3d at 763.  The

5    Court of Appeals for the Ninth Circuit agreed, concluding, first, that the juror did not respond

6    dishonestly on voir dire and did not intend to mislead the trial court when he used the word

7    "assault" instead of "rape" and "kidnap" to describe what had happened to his wife.  Id. at 767.

8    To the extent the juror may have been mistaken in assuming that the words he used would make

9    it apparent that his wife had also been raped, the Ninth Circuit concluded that this was "an honest

10   mistake for a layperson to make."  Id.  The Ninth Circuit also concluded that there was no

11   evidence the juror harbored "actual bias" and that the facts indicated the juror had remained

12   impartial, notwithstanding what had happened to his wife.  Id. at 767-68.

13          Finally, the Ninth Circuit found that the juror in question did not harbor implied

14   bias.  The court noted that the United States Supreme Court has never held that a juror was

15   impliedly biased in the absence of juror dishonesty.  Id. at 771.  In addition, the Ninth Circuit has

16   recognized that "it is an unresolved question whether dishonesty is a necessary predicate to a

17   finding of juror bias."  Id.[5]  The court in Fields also noted that the similarity of experiences

18   between the juror and the defendant was due to the juror's wife's experience, not his own.  The

19   court stated, "[a]lthough we have recognized that bias may be implied where close relatives of a

20   juror "have been personally involved in a situation involving a similar fact pattern . . . we have

21   never done so when the juror was honest on voir dire."  Id. at 773.  The Ninth Circuit concluded:

22   /////

23   /////

24   /////

25   _____

26   [5]  On this basis alone, it would be difficult to conclude that the state courts' rejection of
petitioner's claim of juror bias is contrary to or an unreasonable application of federal law.

> Given [the juror's] honest response on voir dire that revealed a potentially disqualifying relationship, but not an extreme or extraordinary one, and the results of the evidentiary hearing which disclosed no actual bias, we see no basis for inferring bias now as a matter of law.

Id. at 775.

This court is not compelled to reject the conclusion of the California Court of Appeal that Juror No. Two did not respond dishonestly on voir dire or intend to mislead the trial court when she stated that she had not been a witness to a crime, that she had nothing to bring to the court's attention regarding her ability to be impartial, and that she believed she could be impartial. As noted by the state appellate court, the latter two questions seek a statement of opinion, not fact. Further, Juror No. Two repeated during the interview with the trial judge that she honestly thought she could be impartial, notwithstanding the events of her childhood. Juror No. Two's belief that her childhood experiences did not involve a crime was, as in Fields, an honest mistake for a layperson to make. This is also true of her statement that she believed she need not bring up her past experiences unless they would tend to make her impartial. See McDonough, 464 U.S. at 555 (observing that "jurors are not necessarily experts in English usage" and "may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges"); Dennis v. Mitchell, 354 F.3d 511, 521 (6th Cir. 2003) (holding that juror's misunderstanding of a legal term did not connote dishonesty); Dyer, 151 F.3d at 973 (observing that it follows from the holding in McDonough that "an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality"). Further, as stated by the Ninth Circuit in Fields, "[t]o the extent that events or information bearing on [the juror's] honesty in voir dire or impartiality as a juror came after he was empaneled, the evidentiary hearing held by the district court afforded Fields an opportunity to show that [the juror] was not a fair and impartial juror." Fields, 503 F.3d at 773. The same is true here. The

/////

1  interview conducted by the trial court of Juror No. Two demonstrated that this juror did not

2  harbor bias against petitioner because of her childhood experiences.

3       In the absence of juror dishonesty, this court cannot conclude that petitioner has

4  demonstrated actual or implied bias.  Even if juror No. Two's failure to disclose her childhood

5  experiences with domestic violence constituted dishonesty on voir dire, there is no actual

6  evidence in this case of juror bias, either actual or implied.  There is no evidence that the

7  presence of Juror No. Two on petitioner's jury prejudiced petitioner to the extent that he did not

8  receive a fair trial.  Accordingly, petitioner's claims regarding juror bias should be denied.

9       E.  <u>Jury Instruction Error (Claim V)</u>

10      Petitioner claims that several jury instructions given at his trial reduced the

11 prosecutor's burden of proving his guilt beyond a reasonable doubt in violation of his

12 constitutional rights.  (Pet. at 10.)

13      The state court record reflects that immediately prior to Charlotte Scharp's

14 testimony that petitioner assaulted her after placing her in handcuffs in the spring of 1993, the

15 trial court instructed petitioner's jury with CALJIC Nos. 2.50, 2.50.1 and 2.50.2, as follows:

16          Ladies and gentlemen, you're going to hear evidence as I
            understand it of Mr. Travis Reay's use of handcuffs on this witness
17          and the allegation that some physical assault was committed upon
            this witness after she had been handcuffed as I understand it.
18
            And that – in that regard, I am going to give you a limiting
19          instruction in terms of how you may consider this evidence.  This
            instruction will be in your packet of instructions at the conclusion
20          of this trial, and it would be as follows:

21          Evidence has been introduced for the purpose of showing that the
            defendant, Travis Reay, committed an act similar to those
22          constituting a crime other than that for which he is on trial.  This
            evidence, if believed, may not be considered by you to prove that
23          defendant is a person of bad character or that he has a disposition
            to commit crimes.  It may be considered by you only for the limited
24          purpose of determining if it tends to show a characteristic method,
            plan, or scheme in the commission of an act similar to the method
25          plan or scheme used in the commission of the offense in this case,
            which would further tend to show the existence of the intent, which
26          is a necessary element of the crime charged and that defendant

26

1          Reay possessed the means that might have been useful or necessary
2          for the commission of the crime charged.

3          For the limited purpose for which you may consider such evidence,
           you may weigh it in the same manner as you do all other evidence
4          in this case.  You're not permitted to consider this evidence for any
           other purpose.

5          Within the meaning of the preceding instruction, the prosecution
           has the burden of proving by the preponderance of the evidence
6          that defendant, Travis Reay, committed an act similar to those
           constituting a crime other than that for which he is on trial.  You
7          must not consider this evidence for any purpose unless you find by
           preponderance of the evidence that defendant Travis Reay
8          committed an act similar to those constituting a crime.

9          Preponderance of the evidence means evidence that has more
           convincing force than that opposed to it.  If the evidence is so
10         evenly balanced that you are unable to find that the evidence on
           either side of an issue preponderates, your finding on that issue
11         must be against the party who had the burden of proving it.  You
           should consider all of the evidence bearing upon every issue
12         regardless of who witnessed it.

13    (RT at 613-14.)  These instructions were repeated later in the trial. (Id. at 1406.)

14         Petitioner objects to the foregoing jury instructions, arguing as follows:

15         The problem with the above-quoted instructions is that they
           permitted the jury to establish two critical facts based upon proof
16         of less than beyond a reasonable doubt: 1) that petitioner was in
           possession of handcuffs similar to those which Nettie Reay and
17         Scott DeGraff testified as having been used on Dixon just prior to
           her being killed, and 2) that petitioner was "guilty" of having
18         assaulted Charlotte Scharp in the spring of 1993 while employing
           such handcuffs.  The jury was, in turn, permitted to use these two
19         critical facts, established by the lesser preponderance-of-the-
           evidence standard, to resolve the determinative issue in this case:
20         whether Nettie Reay and Scott DeGraff were telling the truth when
           they described petitioner first handcuffing and then stabbing April
21         Dixon.  This being the case, <u>it it logically impossible to escape the
           conclusion that the jury was permitted to resolve the issue of</u>
22         <u>petitioner's guilt regarding the murder of April Dixon upon proof
           of less than beyond a reasonable doubt.</u>

23

24    (Pet. at 11-12.) (emphasis in original.)

25         The California Court of Appeal rejected petitioner's argument in this regard,

26    reasoning as follows:

27

> . . . the defendant's argument is unpersuasive because the reasonable doubt standard only pertains to facts that are essential to conviction.  (citations omitted.)
>
> Inference chains cascade and cumulate.  One need not be certain of all of a number of circumstances individually and yet be certain of a proposition that the aggregate tends to support.
>
> Belief in Scharp's testimony is not critical to the guilty verdict.  A juror could believe her testimony and nonetheless harbor a reasonable doubt that defendant Travis Reay was guilty of murdering Dixon.  Accordingly, the instruction that evidence of the uncharged misconduct should not be considered unless proven by a preponderance of the evidence did not implicate the requirement of proof of guilt beyond a reasonable doubt.

(Opinion at 43.)

A challenge to jury instructions generally does not state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal quotations omitted)).  Petitioner must demonstrate the instruction "'so infected the entire trial that the resulting conviction violates due process.'"  Id. (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).

The state appellate court concluded that the testimony of Charlotte Scharp did not concern facts that were essential to petitioner's conviction, and therefore did not implicate the prosecutor's burden to prove petitioner guilty beyond a reasonable doubt.  This conclusion is not an unreasonable determination of the facts of this case, nor is it contrary to or an unreasonable application of federal law.  Further, contrary to petitioner's argument, the challenged jury instructions did not tell the jurors that his conviction could be based on proof by a preponderance of evidence rather than proof beyond a reasonable doubt.  Rather, petitioner's jurors were specifically informed that each element of the charged offenses must be proven beyond a

28

1 reasonable doubt and that only the prior acts could be proved by a preponderance of the evidence.

2 (RT at 1407, 1412, 1421.)   Cf. Gibson v. Ortiz, 387 F.3d 812, 821-825 (9th Cir. 2004) (trial

3 court's use of the 1996 version of CALJIC No. 2.50.01, together with CALJIC No. 2.50.1

4 violated defendant's right to due process by allowing the jury to find that the defendant had

5 committed uncharged offenses by a preponderance of the evidence and then to infer that he had

6 committed the charged acts also by a preponderance of the evidence).  As set forth above,

7 petitioner's jurors were specifically informed that the prior crimes evidence could not be

8 considered to prove that petitioner had a disposition to commit crimes, but only to show a

9 characteristic method, plan or scheme.  See Burleson v. Kernan, No. C 05-1263 SI (pr), 2007 WL

10 3478432 at *23 (N.D. Cal. Nov. 15, 2007) (denying similar jury instruction challenge on

11 collateral review because the jury instructions given, if carefully followed, would not permit

12 petitioner's conviction based on anything less than proof beyond a reasonable doubt); Gonsalves

13 v. Carey, Civ. S-03-1091 MCE EFB P, 2007 WL 172326 at *14 (E.D. Cal. Jan. 18, 2007); Cf.

14 Gibson, 387 F.3d at 817 (jury was specifically informed that if they found the defendant

15 committed a prior offense they were allowed to also infer that he had a disposition to commit the

16 same or similar offenses, including the offense of which he was accused).

17          After a review of the jury instructions as a whole, this court concludes that the

18 state court's decision that the challenged instructions did not violate petitioner's right to a fair

19 trial is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is

20 not entitled to relief on this claim.

21          F.  Evidence of Prior Acts of Domestic Violence (Claim VI)

22          Petitioner claims that his right to a fair trial was violated because of the jury's

23 exposure to evidence of his prior acts of domestic violence described above.  Petitioner argues

24 that although this evidence was introduced by co-defendant Nettie Reay, in support of her

25 defense to the murder charge, the evidence was irrelevant for that purpose.  Petitioner explains,

26 "in essence, petitioner Travis Reay did not receive a fair trial because extensive, highly

prejudicial evidence of his past acts of domestic violence against Nettie was admitted at trial notwithstanding that, in actuality, this evidence possessed no legitimate relevancy, per the California Supreme Court's holding in Anderson that duress is no defense to murder." (Pet. at 13.)

The question whether evidence of prior uncharged acts was properly admitted under California law is not cognizable in this federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. at 67. The only question before this court is whether the trial court committed an error that rendered petitioner's trial so arbitrary and fundamentally unfair that it violated federal due process. Id. See also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point"). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and ... the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F. 3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal, 926 F. 2d at 920. Even then, evidence must "be of such quality as necessarily prevents a fair trial." Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

Petitioner's trial was not rendered fundamentally unfair because of the admission of evidence of his acts of domestic violence against Nettie Reay.[6] As noted by the state appellate

---

[6] The United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003). In fact, the Supreme Court has expressly left open this question. See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of

1 court, the incidents of domestic violence were decidedly less inflammatory than the

2 circumstances of the charged crimes.  In addition, evidence of domestic violence was relevant to

3 the case against Nettie Reay to show her state of mind.  These are rational inferences the jury

4 could draw from the challenged evidence that are not constitutionally impermissible.

5       Moreover, any claimed error in admitting this testimony did not have "a

6 substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at

7 637.  See also Penry v. Johnson, 532 U.S. 782, 793-96 (2001).  As described above, the evidence

8 against petitioner was overwhelming, consisting of direct evidence from two eyewitnesses and

9 circumstantial evidence from several other witnesses.  Further, any threat of improper prejudice

10 flowing from the testimony was  mitigated by the trial court's instruction directing the jury to

11 consider the uncharged acts testimony only as it was relevant to show the existence of Nettie

12 Reay's intent and/or whether she was a credible witness.  The jury is presumed to have followed

13 this instruction.  Old Chief v. United States, 519 U.S. 172, 196-97 (1997); United States v. Reed,

14 147 F.3d 1178, 1180 (9th Cir. 1998); see also Richardson v. Marsh, 481 U.S. 200, 206 (1987)

15 (referring to "the almost invariable assumption of the law that jurors follow their instructions").

16 For all of these reasons, petitioner is not entitled to relief on this claim.

17       G.  Cumulative Error (Claim VIII)

18       Petitioner claims that his right to a fair trial was violated by the cumulative effect

19 of the errors described in the claims addressed above.

20       The United States Supreme Court has clearly established that the combined effect

21 of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally

22 unfair, even where each error considered individually would not require reversal.  Parle v.

23 Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643

24

25 'prior crimes' evidence to show propensity to commit a charged crime").  Accordingly, on this
26 basis alone, it would be difficult to conclude that the state courts' decision with respect to this
claim was contrary to or an unreasonable application of federal law.

1  (1974) and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "The fundamental question in

2  determining whether the combined effect of trial errors violated a defendant's due process rights

3  is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at

4  294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  Parle,

5  505 F. 3d at 927 (quoting Brecht, 507 U.S. at 637).  In determining whether the combined effect

6  of multiple errors constituted a due process violation, "the overall strength of the prosecution's

7  case must be considered because 'a verdict or conclusion only weakly supported by the record is

8  more likely to have been affected by errors than one with overwhelming record support.'"  Parle,

9  505 F. 3d at 928 (quoting Strickland, 466 U.S. at 696).

10         This court has addressed each of petitioner's claims alleged to have caused

11  prejudicial cumulative error and has concluded that no error of constitutional magnitude

12  occurred.  The court also concludes that the alleged errors, even when considered together, did

13  not render petitioner's defense "far less persuasive," nor did they have a "substantial and

14  injurious effect or influence on the jury's verdict."  This is particularly true here, where the

15  evidence against petitioner was strong.  Accordingly, petitioner is not entitled to relief on his

16  claim of cumulative error.

17         H.  Prosecutorial Misconduct (Claim IX)

18             1.  Petitioner's Claim

19         Petitioner claims the prosecutor committed misconduct during his closing

20  argument when he criticized the testimony of petitioner's alibi witness Stephanie Schaefer.  (Pet.

21  at 14.)  Specifically, petitioner objects to the following portion of the prosecutor's argument to

22  the jury:

23             In this case Ms. Schaefer has Travis's child.  So right there you
                have got to think there is a relationship there.  She told you on the
24             stand she still loves him.  She said she wants him back.  She said
                she would do anything within reason to get him back.  She has
25             visited over fifty times in the jail.  So right there when she testifies
                you have got to keep that in account when you consider what she is
26             saying and whether or not she is actually believable.

32

1    Now, keeping that in mind that Travis is the father of her child, she
2    loves him, she has visited him fifty times, ask yourself when I read
     you these transcript quotes that this actually makes sense.

3    The question:  Did he tell you he was going to turn himself in,
     Travis?
4
     She goes:  Yes, he did.
5
6    Question:  At that time did you contact law enforcement to give a
     statement?

7    Answer:  I never contacted law enforcement, no.

8    Question:  When is the first time you were contacted by defense
     attorneys in this case?
9
10   Answer:  I talked to his attorney for the first time last week, made
     my statement for the first time.

11   Right there you should say that is a complete joke.  How can
     someone be the mother of a child, love this person, you are with
12   him when he says he is going to turn himself in, you are aware he
     is going to be turning himself in for murder, the logical question
13   would be when did this murder happen.

14   Certainly the logical inference is that Travis knows when it
     happened because he is charged with a crime that says on or about
15   the 16th of August of 1993.  He tells her all this, and what does she
     do?  Does she go down to law enforcement with him and give a
16   statement?  No.  Doesn't that right there cause you to think she is
     full of it, I don't want to believe anything she says?

17

18   (RT at 1272-73.)

19        Petitioner also objects to the following portion of the prosecutor's closing

20   argument, delivered after the above-described remarks:

21   So then he comes to Stephanie Schaefer and says well, let's stick
     with her, and under cross-examination on her, to come up a goose
22   egg, I don't think so.  All you have to do is ask her why didn't you
     go to the police when you are with him the day he turns himself in?
23   And she gives a lame response about I'm not sure what I was
     supposed to do, I thought I would wait until I was contacted.
24   That's bull, I'm going to let him sit in jail for two years and I will
     wait for my starring moment and come into court and look like a
25

26   /////

33

1    fool on the stand when I talk about how I was with him and have
     no explanations for any of it.

2

3    (Id. at 1387-88.)

4          Petitioner contends that the prosecutor knew his argument in this regard was false.

5    In this regard, petitioner argues,

6          In fact, the prosecutor's implication was false and the prosecutor
           knew it to be false:  Schaefer had been in contact with defense
7          counsel's investigator and had informed him of her potential alibi
           testimony from the time of petitioner's arrest.  Moreover, the
8          district attorney's office had subpoenaed Schaefer to testify as a
           prosecution witness at the time of petitioner's preliminary hearing
9          in April 1997, although she was not actually called to the witness
           stand at that time.  The prosecutor's misleading argument thus
10         unfairly undermined petitioner's alibi defense in the eyes of the
           jury.

11

12   (Pet. at 15.)

13         2.  Standard of Review

14         On July 31, 2000, petitioner filed a petition for writ of habeas corpus in the

15   California Court of Appeal, raising the following claims: (1) the prosecutor committed

16   misconduct in closing argument; (2) his trial counsel rendered ineffective assistance when he

17   failed to object to the prosecutor's improper argument; (3) his trial counsel rendered ineffective

18   assistance when he failed to call petitioner's sister and one "Kimberly Taylor" as defense

19   witnesses; and (4) newly discovered evidence indicated he was factually innocent of the murder.

20   (Resp'ts' Lodged Document 12 (Petition for Writ of Habeas Corpus, California Supreme Court,

21   S120319), Attach., page 2.)  This petition was denied with a citation to In re Hillery, 202 Cal.

22   App. 2d 293 (1962).[7]  (Id.)

23   /////

24

25         [7]  In In re Hillery the state appellate court held that absent a showing of an extraordinary
     circumstance warranting action by the court of appeal in the first instance, post-conviction claims
26   should be presented to the superior court before they are presented to the court of appeal.  202
     Cal. App. 2d at 294.

                                        34

1        On March 13, 2001, petitioner filed a petition for a writ of habeas corpus in the

2  California Superior Court, in which he raised the same four claims.  (Id.)  The Superior Court

3  denied petitioner's claim of prosecutorial misconduct on the grounds that the claim should have

4  been raised on appeal, denied petitioner's claims of ineffective assistance of counsel on the

5  merits, and made no mention of petitioner's claim of newly discovered evidence of actual

6  innocence.  (Pet'r's Lodged Document 12, Ex. G.)  On November 20, 2001, petitioner filed a

7  petition for writ of habeas corpus in the California Supreme Court, in which he raised these same

8  claims.  (Resp'ts' Lodged Document 6.)  That petition was summarily denied.  (Id.)  It appears

9  from the foregoing that no state court has issued a decision on the merits of petitioner's claim of

10  prosecutorial misconduct.  Accordingly, this court will analyze that claim de novo.  Nulph, 333

11  F.3d at 1056.

12        3.  Legal Standards

13        A defendant's due process rights are violated when a prosecutor's misconduct

14  renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

15  However, such misconduct does not, per se, violate a petitioner's constitutional rights.  Jeffries, 5

16  F.3d at 1191 (citing Darden, 477 U.S. at 181 and Campbell v. Kincheloe, 829 F.2d 1453, 1457

17  (9th Cir. 1987)).  Claims of prosecutorial misconduct are reviewed "'on the merits, examining the

18  entire proceedings to determine whether the prosecutor's [actions] so infected the trial with

19  unfairness as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63

20  F.3d 926, 929 (9th Cir. 1995) (citation omitted).  See also Greer v. Miller, 483 U.S. 756, 765

21  (1987); Donnelly, 416 U.S. at 643; Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002).  Relief

22  on such claims is limited to cases in which the petitioner can establish that prosecutorial

23  misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at

24  637-38); see also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868.  Put another way,

25  prosecutorial misconduct violates due process when it has a substantial and injurious effect or

26  /////

1  influence in determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th

2  Cir. 1996).

3            In considering claims of prosecutorial misconduct involving allegations of

4  improper argument the court is to examine the likely effect of the statements in the context in

5  which they were made and determine whether the comments so infected the trial with unfairness

6  as to make the resulting conviction a denial of due process.  Turner, 281 F.3d at 868; Sandoval v.

7  Calderon, 241 F.3d 765, 778 (9th Cir. 2001); see also Donnelly, 416 U.S. at 643; Darden, 477

8  U.S. at 181-83.  Thus, in order to determine whether a prosecutor engaged in misconduct during

9  closing argument, it is necessary to examine the entire proceedings to place the challenged

10 remarks in context.  See United States v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial

11 comment must be examined in context. . . .");  Greer, 483 U.S. at 765-66; Williams v. Borg, 139

12 F.3d 737, 745 (9th Cir. 1998).  In fashioning closing arguments, prosecutors are allowed

13 "reasonably wide latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and

14 are free to argue "reasonable inferences from the evidence."  United States v. Gray, 876 F.2d

15 1411, 1417 (9th Cir. 1989).  See also Ducket v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995).

16 "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although

17 they may not, of course, employ argument which could be fairly characterized as foul or unfair."

18 United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

19            4.  Background

20            As noted by respondents, petitioner contended at trial that the murder occurred

21 late Sunday, August 15 or early Monday August 16, 1993.  The prosecution argued that the

22 murder occurred late Saturday, August 14 or early Sunday, August 15.  (Answer at 32.)

23 Stephanie Schaefer provided an alibi for the period late Sunday, August 15 through the morning

24 of August 17, 1993.  (RT at 1136, 1138-39, 1144, 1151.)  Petitioner did not offer an alibi for the

25 period of time from late Saturday, August 14 to early Sunday, August 15.

26 /////

During the prosecution's cross-examination of Ms. Schaefer, plaintiff's alibi witness, the following exchange occurred:

> Q. (by the prosecutor):  Did you talk to [petitioner] prior to him going into custody?
>
> A. (by Stephanie Schaefer):  I had seen him the day he turned himself in.
>
> Q. Did he tell you he was going to turn himself in?
>
> A. Yes, he did.
>
> Q. At that time did you contact law enforcement and give a statement?
>
> A. I never contacted law enforcement, no.
>
> Q. When is the first time that you were contacted by defense attorneys in this case?
>
> A. I talked to his attorney for the first time last week, made my statement for the first time.
>
> Q. When did you first get contacted by defense attorneys?
>
> A. I'm not quite sure.

(RT at 1140.)  Upon further questioning, Schaefer estimated that she was first contacted by defense attorneys "in the springtime," and maybe "as late as June."  (Id.)[8]  Schaefer explained that her first contact with the defense was when an investigator called her and asked Schaefer whether she had anything to "share" with the defense.  (Id. at 1141.)  She responded that she would rather talk to petitioner's attorney directly.  (Id. at 1142.)  The next day, the investigator drove Schaefer to meet with petitioner's trial counsel.  (Id.)

Later in her testimony, Schaefer stated she didn't think about contacting law enforcement at the time petitioner turned himself in.  (Id. at 1152.)  She stated she asked petitioner's mother whether she should make a statement and she "was told that I would be

_____

[8] Petitioner's trial commenced on August 3, 1998 and Schaefer testified on August 27, 1998.

1 contacted when they need me." (Id.)  Schaefer further explained she didn't think she was

2 "supposed to" call the Sheriff's Department, but was "supposed to wait until his attorney

3 contacted me."  (Id.)  In his claim before this court, petitioner argues that the prosecutor, in his

4 closing remarks, falsely stated that Schaefer didn't come forward with her alibi until just before

5 trial, when in fact the prosecutor knew that Schaefer had been willing to inform the appropriate

6 authorities of petitioner's whereabouts at the time in question much earlier.

7           5.  Analysis

8           This court concludes that the prosecutor's challenged remarks did not unfairly

9 characterize Schaefer's testimony or convey a knowingly false impression to the jury.  The

10 prosecutor was trying to make the point that Schaefer's alibi testimony was suspect because she

11 had failed to report it until she was contacted by petitioner's attorney shortly before the trial.

12 This was a fair argument based on Schaefer's trial testimony.  Contrary to petitioner's claim,

13 Schaefer did not testify that she told the defense investigator about petitioner's alibi at the time of

14 his arrest.  On the contrary, she testified that she was not contacted by the investigator until

15 shortly before the trial.  Further, petitioner's contention that the prosecution subpoenaed Schaefer

16 as a witness at the preliminary hearing, even if true, is not dispositive of this claim.  There is no

17 indication from the record as to why the prosecutor might have subpoenaed Schaefer at that time,

18 and this court will not speculate on a reason.  Viewing the prosecutor's closing argument in its

19 entirety, this court concludes the challenged comments were a reasonable inference from the

20 testimony given by Schaefer at petitioner's trial.  Accordingly, petitioner is not entitled to relief

21 on this claim.

22      I.  Ineffective Assistance of Trial Counsel

23           Petitioner has raised several claims of ineffective assistance of trial counsel in

24 addition to those discussed above.  The court will evaluate these claims below.

25 /////

26 /////

1          1.  <u>Counsel's Failure  to Object to the Prosecutor's Misconduct in Closing</u>

2    <u>Argument (Claim X)</u>

3          Petitioner claims that his trial counsel rendered ineffective assistance because of

4    his failure to object to the above-described comments during the prosecutor's closing argument

5    and his failure to "take steps to ensure that the jury learned that defense witness Stephanie

6    Schaefer first told a defense investigator of her potential alibi testimony shortly following

7    petitioner's arrest."  (Pet. at 15.)  Petitioner also argues, "to the extent that trial counsel's delay or

8    inaccuracies in revealing Schaefer's known status as a defense alibi witness may have

9    contributed to the prosecutor's feeling justified in making the closing argument set forth [in the

10   claim above], defense counsel was likewise ineffective in engaging in such conduct."  (<u>Id.</u>)

11         Petitioner has failed to demonstrate prejudice with respect to this claim.  As

12   described above, the prosecutor did not commit misconduct by virtue of his comments on the

13   alibi testimony of Stephanie Schaefer.  There is, of course, no obligation to raise meritless

14   arguments on a client's behalf.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a showing of

15   deficient performance as well as prejudice).  Accordingly, petitioner's trial counsel did not render

16   ineffective assistance by failing to object to the prosecutor's argument.

17         Petitioner has also failed to demonstrate that his trial counsel was deficient in

18   failing to present evidence that Schaefer told a defense investigator about petitioner's alibi

19   shortly after he was arrested.  First, there is no evidence that Schaefer made such a statement to

20   anyone at or around the time of petitioner's arrest.  Rather, as noted above, Schaefer testified at

21   trial that she was first contacted by defense attorneys through an investigator perhaps as late as

22   June of 1998[9] and met with counsel the following day where she made her statement in support

23   of petitioner's alibi for the first time. (RT at 1140-42.)  Even if Schaefer had been willing to

24   testify that she told a defense investigator about petitioner's alibi shortly after his arrest, defense

25

26        [9]  Petitioner's trial commenced on August 3, 1998. (RT at 1.)

1   counsel could have reasonably decided as a tactical matter not to challenge the credibility of his

2   alibi witness by contradicting her previous trial testimony.  See Strickland, 466 U.S. at 687)

3   (counsel's tactical decisions are "virtually unchallengeable").  Accordingly, petitioner is not

4   entitled to relief on this claim.

5       2.  Counsel's Failure to Call Petitioner's Sister to the Witness Stand to Testify in

6   Support of His Alibi Defense (Claim XI)

7       Petitioner claims that his trial counsel rendered ineffective assistance "in

8   unreasonably electing not to call petitioner's sister, Melinda McCullar, to the witness stand" in

9   support of petitioner's alibi defense.  (Pet. at 15.)  Petitioner states that he asked his counsel to

10  call Ms. McCullar but that he failed to do so.  Petitioner notes that the prosecutor argued to the

11  jury that if the account of petitioner's alibi witness was truthful, his sister would have been called

12  to the stand to support it. (Id. at 16; see RT at 1388.)  Petitioner also informs the court of the

13  following:

14          When state appellate counsel contacted [trial counsel] concerning
            this matter, [trial counsel] explained that he had interviewed Ms.
15          McCullar, but decided that she would not make a good defense
            witness because she was not articulate and possessed only
16          borderline intelligence.  Appellate counsel then spoke to Ms.
            McCullar by telephone and strongly disagreed with [trial
17          counsel's] representation .  Ms. McCullar was articulate and she
            stated that she had been ready, willing and able to testify in support
18          of petitioner's alibi defense.

19  (Pet. at 16.)

20      It appears that petitioner's trial counsel knew petitioner's sister was willing to

21  testify in support of petitioner's alibi defense.  He chose, however, not to call her as a witness

22  because he believed she would not have been a credible or helpful witness for the defense.  This

23  tactical decision may not form the basis of a claim of ineffective assistance of counsel.  See

24  Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995) ("[a]s a matter of trial strategy,

25  counsel could well decide not to call family members as witnesses because family members can

26  be easily impeached for bias").

Even assuming arguendo that trial counsel's failure to call petitioner's sister as a witness to support petitioner's alibi defense fell below an objective standard of reasonableness, petitioner has failed to demonstrate prejudice stemming therefrom.  As noted above, the prosecutor argued that the murder took place at a time for which petitioner had no alibi.  If the jury believed the prosecutor's theory as to the date and time of the murder, an alibi for a different date would not have had a significant impact on the verdict.  Further, the jury was informed by both Stephanie Schaefer and David Coe that petitioner was in their presence from August 15 through August 17.  The absence of cumulative evidence on this point from petitioner's sister would not have resulted in a different outcome at trial.

For the foregoing reasons, the decision of the California Superior Court rejecting petitioner's claim of ineffective assistance of counsel is not contrary to or an unreasonable application of Strickland.  Accordingly, petitioner is not entitled to habeas relief on this claim.

J.  Newly Discovered Evidence

Petitioner raises two claims of "newly discovered evidence" of factual innocence. As described above in connection with petitioner's claim IX, it appears that no state court has issued a decision on the merits of these claims.  Accordingly, the court will review them de novo. Nulph, 333 F.3d at 1056.

1.  Potential Testimony of Angela Wolfe (Claim XII)

Petitioner claims that "newly discovered evidence" demonstrates his "factual innocence" of the murder.  (Pet. at 16.)  Petitioner explains as follows:

> Angela Wolfe was another woman housed in the North Sacramento
> jail at the same time as codefendant Nettie Reay.  A member of
> petitioner's family informed state appellate counsel that a named
> friend of hers discussed this case with Wolfe.  Wolfe said that
> Nettie Reay had told her that she would lie to implicate petitioner
> in the Dixon murder.  Accordingly, Wolfe's potential testimony
> represents newly discovered evidence, providing grounds for
> habeas corpus relief.

/////

41

1   (Id. at 16-17.)  Petitioner states that he was prevented from presenting this claim "more fully" in

2   state court because the California Court of Appeal and the California Supreme Court denied his

3   motions for habeas counsel and for funds to investigate his claims of actual innocence.  (Id. at

4   17.)

5           In Herrera v. Collins, 506 U.S. 390 (1993), a capital case, a majority of the

6   Supreme Court assumed without deciding that the execution of an innocent person would violate

7   the Constitution.  A different majority of the Supreme Court explicitly so held.  Compare 506

8   U.S. at 417 with 506 U.S. at 419 and 430-37.  See also House v. Bell, ___ U.S. ___, 126 S. Ct.

9   2064, 2084 (2006) (declining to resolve whether federal courts may entertain claims of actual

10  innocence but concluding that the petitioner's showing of innocence in that case fell short of the

11  threshold suggested by the Court in Herrera); Jackson v. Calderon, 211 F.3d 1148, 1164 (9th Cir.

12  2000); Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).  Although the Supreme

13  Court did not specify the standard applicable to this type of "innocence" claim, it noted that the

14  threshold would be "extraordinarily high" and that the showing would have to be "truly

15  persuasive." Herrera, 506 U.S. at 417.  See also Carriger, 132 F.3d at 476.  The Ninth Circuit has

16  determined that in order to be entitled to relief on such a claim a petitioner must affirmatively

17  prove that he is probably innocent.  Jackson, 211 F.3d at 1165; Carriger, 132 F.3d at 476-77.

18          A habeas petitioner's claim of actual innocence must be supported "with new

19  reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness

20  accounts, or critical physical evidence – that was not presented at trial."  Schlup v. Delo, 513

21  U.S. 298, 324 (1995).  To prevail, a petitioner making an actual innocence claim "must show

22  that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than

23  not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"

24  Majoy v. Roe, 296 F.3d 770, 776 (9th Cir. 2002) (quoting Schlup, 513 U.S. at 327).  See also

25  Sistrunk v. Armenakis, 292 F.3d 669, 672-73 (9th Cir. 2002) (en banc) (concluding that

26  petitioner's claim of actual innocence seeking to discredit a prosecution's witness, rather than

42

1    affirmatively presenting new exculpatory evidence, does not fundamentally call into question the

2    reliability of petitioner's conviction); Gandarela v. Johnson, 286 F.3d 1080, 1086 (9th Cir. 2002)

3    (concluding that new evidence that raised questions about the victim's motive to lie but which

4    did not provide direct evidence regarding the commission of the crime, did not present a

5    colorable claim of actual innocence).

6           Even assuming arguendo that a claim of actual innocence is cognizable in this

7    non-capital case, petitioner has failed to make the required showing.  Petitioner's unsupported

8    statement that an unnamed family friend had a conversation with an inmate in the North

9    Sacramento jail who spoke to Nettie Reay is not "reliable" evidence, nor does it demonstrate that

10   petitioner is probably innocent of the murder for which he was convicted.  Petitioner's argument

11   that he was improperly prevented from presenting this claim more fully in his state habeas

12   petition is unavailing.  The Sixth Amendment right to counsel does not extend to collateral

13   proceedings in state court.  Bonin v. Vasquez, 999 F.2d 425, 429 (9th Cir. 1993) ("Clearly, there

14   is no constitutional right to counsel on habeas.").  For these reasons, petitioner is not entitled to

15   relief on this claim.

16          2.  Potential Testimony of Kimberly Taylor (Claim XIV)

17          Petitioner explains his second claim of "newly discovered evidence" of actual

18   innocence as follows:

19          Kimberly Taylor was a woman who shared a jail cell with
             petitioner's codefendant, Nettie Reay.  Prior to trial, Ms. Taylor
20          contacted defense counsel Corbin and indicated that she had
             information which might he helpful to petitioner.  This consisted of
21          jail cell conversations between Nettie Reay and Taylor to the effect
             that Nettie Reay intended to falsely implicate petitioner in the
22          murder of April Dixon.  Defense counsel Corbin had an
             investigator contact Taylor, but at that point she refused to be
23          interviewed.  Mr. Corbin then subpoenaed Taylor to testify at trial.
             When she came to court, she likewise refused to be interviewed by
24          Mr. Corbin.  Therefore, Mr. Corbin did not call her to the witness
             stand.  Petitioner believes that, given the elapse of time, it is
25          reasonably probable that if an investigator now personally
             contacted Taylor that she might now be willing to testify in
26          accordance with her initial contact with Mr. Corbin.  Taylor's

1         potential testimony to the effect that Nettie Reay told Taylor that
   she would lie to implicate petitioner in the Dixon murder would
2         constitute new evidence providing grounds for habeas corpus
   relief.
3

4  (Pet. at 18.)

5         Petitioner has also failed to make the required showing to prevail on this claim of

6  actual innocence.  Petitioner's unsupported speculation that Kimberly Taylor would change her

7  mind and now be willing to testify about statements allegedly made to her by Nettie Reay does

8  not constitute reliable evidence demonstrating that petitioner is actually innocent of Angel

9  Dixon's murder.  The court also notes that, even if Kimberly Taylor testified in accordance with

10 petitioner's expectations, a rational juror could have found petitioner guilty of murder.

11 Accordingly, petitioner is not entitled to relief on this claim.

12        K.  <u>Improper Ruling by the California Court of Appeal (Claim XIII)</u>

13        Petitioner claims that his Fourteenth Amendment right to equal protection of the

14 laws was violated when the California Court of Appeal for the Third Appellate District denied

15 motions filed by petitioner's appellate attorney to expand his appointment for purposes of filing a

16 state habeas corpus petition and to provide funds for a habeas investigation.  Petitioner contends

17 that these motions would have been granted if his appeal had been pending before the First,

18 Second, or Sixth Appellate Districts.  In support of this claim, petitioner has filed the declaration

19 of his appellate counsel, which was attached to petitioner's application for a petition for writ of

20 habeas corpus filed in the California Supreme Court.  (Pet., Ex. C.)  In the declaration, appellate

21 counsel states that, based on his experience, he believes that "it is almost certain that if Mr.

22 Reay's appeal had been pending in the First, Second or Sixth Appellate Districts [he] would have

23 been permitted to spend at least $750 investigating Mr. Reay's potential habeas claims and that

24 [he] would have been reasonably compensated for [his] time and expenses in preparing a habeas

25 corpus petition on [petitioner's] behalf under the policies of those appellate districts."  (<u>Id.</u>)

26 /////

1        Petitioner cites the decisions in <u>Bush v. Gore</u>, 531 U.S. 98 (2000) and <u>Myers v.

2   Ylst</u>, 897 F.2d 417 (9th Cir. 1990) in support of this claim in this regard.  These cases are not on

3   point.  In <u>Myers</u>, the petitioner provided evidence that the state court afforded one person the

4   retroactive benefit of a ruling on the right to an impartial jury while denying it to the petitioner on

5   identical facts.  <u>Myers</u>, 897 F.2d at 423.  Petitioner has provided no such evidence.  In <u>Bush v.

6   Gore</u>, the United States Supreme Court held that  held that the Equal Protection Clause required

7   uniform and specific standards for vote counting.  531 U.S. 105-06.  The Supreme Court

8   expressly limited its analysis to the unique circumstances relating to the 2000 presidential

9   election process in Florida and the various recount procedures developed to address those

10  circumstances.  531 U.S. at 109 ("Our consideration is limited to the present circumstances, for

11  the problem of equal protection in election processes generally presents many complexities").

12  The holding in <u>Bush v. Gore</u> does not apply to the circumstances presented here.  <u>See</u> <u>Coleman v.

13  Quarterman</u>, 456 F.3d 537, 542-43 (5th Cir. 2006) (concluding that "<u>Bush v. Gore</u>'s utter lack of

14  implication in the criminal procedure context" is beyond debate), <u>cert.</u> <u>denied</u>, ___U.S.___, 127

15  S. Ct. 2030 (2007);

16        No constitutional provision or federal law entitles petitioner to state collateral

17  review.  <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987).  Therefore, unless state collateral

18  review violates some independent constitutional right, errors cannot form the basis for federal

19  habeas corpus relief.  <u>See</u> <u>Hubbart v. Knapp</u>, 379 F.3d 773, 779 (9th Cir. 2004) (errors in a state

20  post-conviction review proceeding are not addressable through federal habeas corpus), <u>cert.

21  denied</u>, 543 U.S. 1071 (2005); <u>Franzen v. Brinkman</u>, 877 F.2d 26 (9th Cir. 1989) (same, joining

22  four other circuits).  There is no evidence of an independent constitutional violation here.

23  Petitioner's claim that his motions for the appointment of habeas counsel and funds for an

24  investigation would have been granted by other state appellate courts, and his appellate counsel's

25  opinion to the same effect, are based on pure speculation.  Further, petitioner has failed to

26  demonstrate, or even to allege, that the Third District Court of Appeal's decision not to expand

1  the appointment of his appellate counsel was based on race, religion, or any other arbitrary

2  classification.  The fact that different districts of the California Court of Appeal may apply

3  different standards in practice for the appointment of counsel in collateral proceedings does not

4  constitute an equal protection violation where there is no evidence that the standards are applied

5  in a discriminatory fashion.  See Oyler v. Boles, 368 U.S. 448, 456 (1962) ("the conscious

6  exercise of some selectivity in enforcement is not in itself a federal constitutional violation").

7           For these reasons, petitioner is not entitled to relief on this claim.

8                                CONCLUSION

9           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

10  a writ of habeas corpus be denied.

11           These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within ten days after service of the objections.  The parties are advised

17  that failure to file objections within the specified time may waive the right to appeal the District

18  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: January 16, 2008.

21                                _____

22                                DALE A. DROZD
                                 UNITED STATES MAGISTRATE JUDGE

23  DAD:8
    reay2067.hc

46